Childress v. Colvin Good morning. May it please the court, my name is Eddie Pierre-Pierre and I represent the appellant Stacey Childress. The appellant advances two arguments in support of her position. Essentially that the ALJ failed to evaluate the treating doctor's opinion consistent with the correct legal principles. Secondly, the ALJ failed to competently explain the adverse credibility findings with specific reasons that were supported in the record. These errors on the part of the ALJ resulted in the ALJ failing to build an accurate and logical bridge from the evidence to her conclusions as required by this court. Regarding the first point with respect to the finding to give controlling weight to the treating sources, the ALJ cites three reasons, three points. First, she says that Mr. Childress has increased symptoms after non-compliance with medications. The infant's there presumably that if he would take his medications he'd be fine. Secondly, that he has a New York Heart Association class 3 rating which she defines as being comfortable at rest and therefore finds that Mr. Childress can do a sedentary job or sedentary work within the arts. So how many times have we sent this case back? The district court sent it back once and we're here today. We came back on appeal. We were denied by the district court and we're here, Your Honor. So it's been back once but from the, did we hear this case once? No. We did not. The district court sent it back. The district court sent it back. You probably heard many like it, Your Honor. Yes. So the second point is the New York Heart Association class 3 that the judge finds supports a sedentary ROC because he can be comfortable at rest. And a third point for denying controlling weight to the doctors was that Dr. Adai, the cardiologist, recommended he walk 30 minutes a day, 5 to 7 days a week. I want to start out by pointing out the period at issue is a five-year period from November 2008 to January 2014 that we're talking about. And I'd like to first address the non-compliance issue, which is important, particularly since the ALJ uses the non-compliance to also draw an adverse credibility finding. So with respect to the period at issue, I found four instances in the record of non-compliance that we cite in our brief. January of 2009, April of 2009, then it jumps to August of 2010, then again in June of 2013. The government in their brief points out February 2011, occasionally occasion, but I note that that is a treatment record from Dr. Adai, the cardiologist, who's given a historical accounting and refers to the 2010 incident as a period of non-compliance due to an inability to afford. That's at 527 of the administrative record. In fact, all of the instances I've cited were due to the appellant's inability to afford his medication. In fact, a month prior to the period at issue began, or two months in September of 2008, he expresses frustration to his primary care provider, being unable to afford his medication because his benefits or public benefits keeps getting cut off. And throughout the record it says he can't afford his medication. So we have here non-compliance that's sporadic four times, maybe five if the government finds another over a five-year period, certainly not willful and due to his inability to afford the medication. So we know that Drs. Adai and Hartman were obviously aware of this because it's contained in their treatment notes, but notwithstanding that they didn't find that it had any appreciable effect on his functional capacity and his condition overall because we know, after all, he sits at 5'9", 273 to 353 pounds during the period at issue, so he's markedly obese. He also suffers from chronic obstructive pulmonary disease. He has congestive heart failure and cardiomyopathy. So the combined effect is what the doctors had in mind when they offered their RFC opinion. With respect to the New York Heart Association classification, the judge finds, in declining to give controlling weight to the treating sources, the judge finds that that definition of class 3 rating is that he is comfortable at rest. But we know that the definition of class 3 rating is that it's indicative of marked limitation in physical activity and less than ordinary physical activity causes fatigue, dyspnea, or angina pain. So what the judge here does is she leaves out the portion of the definition, which is that less than ordinary physical activity causes these symptoms. And clearly the doctors, Drs. Adai and Hartman, the primary care and the cardiologists, were aware of what it meant to be at a class 3 rating, and their opinions were further supported by the various ejection fraction findings that fluctuated throughout the record. And during the period at issue, the government highlights one time when it went up to 66%, which would be normal in terms of the ejection fraction finding. However, I'll point out in that same test, which was in 2010, I believe it was an October 2010 test, that was a left ventricle, I believe, was at 43% and defined as borderline normal. At all other relevant times, the ejection fraction was between 15% and 35%. What kind of educational background does he have? I believe Mr. Childress was a high school graduate. He's just a high school graduate? To my knowledge, Your Honor, I'm not positive, but that's what I believe to be his background. He was a cook and a satellite installer. He worked for, I think, Dish TV, something or the other. So with respect to their opinions as well, the other notation the judge makes is that after the remand, which occurred in 2013, the initial remand, the district court remand, that the record didn't support disability, and then she goes on to cite a June 2013 hospitalization where Dr. Adai, the cardiologist, performs a cardiac catheterization and finds that he has decompensation of his already existing congestive heart failure. So it's difficult to conceive how that does not support the doctor's opinion that he's not able to do any work or that he's at a less than sedentary capacity. The other point that the judge relies upon is the doctor's recommendation that the plaintiff walk. The government points out that it says throughout the record that he walks daily, and indeed he's following his doctor's orders. He's attempting to walk daily. But the records, the treatment records, those same treatment records, each one says he walks one block or one and a half blocks before he's short of breath and he can't walk. Most of the records or many of the records highlight that he also suffers from fatigue, extreme fatigue, on mild exertion or on no exertion. He testified in the first hearing, which was in 2010, that he could walk about a block or a block and a half, consistent with the treatment notes, before he gets shortness of breath. By the time of the second hearing, he couldn't even do that. He testified he couldn't walk from the parking lot into the hearing location, which he described as being 50 to 70 feet. So yes, he walked, but the doctor's recommendation that he attempt to walk for 30 minutes was no reason to decline to give them controlling weight. Importantly, the judge, the ALJ, did not properly articulate what weight, if any, she would give to those opinions when she declined to give them controlling weight. Had she done so, I think it would have been borne out that the doctors would have gotten at least great weight in the determination process. The length, nature, and extent of their relationship is consistent. The patient sees the cardiologist every two months and the primary care physician about a month or every other month. Their treatment notes, which we do look at and take a common sense approach of it, are very consistent. He presents with complaints, extreme fatigue, dyspnea, edema, lower leg swelling, inability to stand, inability to walk. He has objective findings, such as the ejection fraction testing that's done throughout the period at issue. He has poor exercise tolerance. I see that my time for rebuttal, I'm into, so I'll conclude at this point. Let me just ask you a question. The Administrative Law Judge's decision of January 21, 2014, is this the second round? That was the Administrative Law Judge's second decision. The second decision. That is correct. Thank you very much. Thank you. Ms. Han? May it please the Court, Mr. Pierre, Lou Han on behalf of the Commissioner. We have a great deal of evidence in this case from the period with the prior ALJ decision up through the review of this current ALJ decision shows over nine pages, single spaced, of a discussion of the relevant medical evidence. And Mr. Childress dislikes how the ALJ came out. However, there's really no allegation and Mr. Childress cannot point to any relevant evidence that the ALJ mischaracterized or that the ALJ should have considered. The ALJ found several severe impairments including the congestive heart failure, COPD, the sebaceous cysts of the head, and of the spine. I'm just looking at this second ALJ decision. This guy is in a ghastly state of health and it's right here in the Administrative Law Judge. I'm looking at, it says he's 69 inches tall and he weighs 350 pounds. He has heart disease. They keep mentioning he's got COPD, chronic obstructive pulmonary disease. That is a very serious disease. And you put that on top of a person who weighs 350 pounds and he has heart disease and he can barely walk, take a shower. He has a friend, that's cited as good for him. But as I say, just looking at what the Administrative Law Judge says about these conditions that he has. He has trouble breathing. He's tired. His symptoms worsen with movement. He experiences chest pains, tightness in his chest at night when lying down and sometimes when walking too much. Shortness of breath. He has memory and concentration problems. And on and on. He doesn't take strong codeine or morphine-based analgesics, usually prescribed for severe and unremitting pain. Well, you can see how someone might not want to take morphine-based analgesics for anything. His recent medication list included amlodipine, Coric, digoxin, metalozone, furosemide, hydrolyside, ventolin, and proventil inhalers. That's an extraordinary collection of very strong drugs to be taking. I don't know if it's daily or frequently. This is the Administrative Law Judge's own recitation. It just seems that he's in terrible, terrible shape. Well, Your Honor, that's true. And the ALJ talks about all of it. And he doesn't have college, right? No, I believe. Now, what about the jobs that a vocational expert thinks he can perform? Addressor, charge account clerk, order clerk. The vocational expert apparently doesn't discuss what the requirements for these jobs are, either physical or mental requirements. Well, Your Honor, neither party briefed that issue at the district court or here, but I'm happy to discuss what occurred at the hearing, the second hearing in 2013 with Mr. Lampley, I believe, the vocational expert. He responded to several questions from both the ALJ as well as the then-attorney for Mr. Childress. And with the RFC that matched the one found in the ALJ's citation. What is the basis for the Administrative Law Judge having, I think this was in the first round, rejecting so many of his doctor's conclusions about his physical state? Aren't they reputable doctors or what? Are they quacks? Certainly nothing in the ALJ's decision indicates that she found them to be quacks or disreputable. Why doesn't she accept their evidence? As she explained in the decision, the record from the entire relevant period of the issue shows that when Mr. Childress is taking the list of medications that Your Honor noted that the ALJ discussed, she was very thorough in this entire decision, that when he takes those, the ejection fraction number prior to the relevant period was 57%. Then during 2009-2010. But what about the effects of taking so many high-powered drugs? When he was taking those drugs, his cardiologist, Dr. Adai, in November 2009, told him to keep going with the moderate exercise, and that when he was compliant with those drugs, Mr. Childress was able to comply with those recommendations. He did not comply with the recommendation to stop smoking cigarettes or marijuana, but during 2009 he also worked part-time. Let's just focus on the COPD. So what is he getting for that? He's taking an inhaled steroid, I believe, and perhaps other medications as well. And what are the effects of the medications? The side effects, Your Honor, I don't believe here in his brief. Does he breathe normally? He actually, at times, in appointments with the cardiologist, as well as with a primary care physician, Dr. Contaldo, a physician's assistant, Munch, he denied the other-than-occasional shortness of breath and some of those fatigue symptoms related to COPD. Well, you say occasional. So how many days would he be likely to miss in a month of working? Well, Your Honor, the treating physicians, Dr. Hartman and Adai, said more than three days a month. But there's really no indication in this record why... Well, it doesn't, right? You lose three days a month for illness, you lose your job. That is work-preclusive. So isn't that a likely consequence of someone with all these ailments and all these drugs? Respectfully, Your Honor, that's just not borne out by this record. He has severe impairments, as the ALJ discussed, as Your Honor went through in this decision, but it's simply not clear why, when he's compliant with those medications, when he's able to raise tolerances up, when he was able to work on a part-time basis for at least eight months... Well, what are the side effects of all of these medications? Your Honor, I'm not exactly sure on those side effects. There's such a long list, and I don't recognize them. I would think they would have some debilitating effect. Well, importantly, Your Honor, Mr. Childress himself is not alleging that here in his appeal. Pardon? Mr. Childress has not alleged that it's the side effects of this list of medications that the ALJ should have considered. Mr. Childress, as Mr. Pierre said, is really relying on his noncompliance, the activities, as well as the ejection fracture and the New York Heart Association classification evidence. Not so much any particular side effects... Now, what's wrong with those classifications? Nothing is wrong with those classifications, Your Honor, and in fact, the ALJ talked about it in the listing analysis under Step 3 to find whether or not Mr. Childress would be per se disabled if he met a listing. And the listing with regard to heart failure, which is related to the classification from the New York Heart Association, is Listing 4.02. And it's in that listing that actually ejection fraction comes up, because if you are consistently at below 30% ejection fraction, that is something that can meet, I believe, Part A of Listing 4.02. But as the ALJ discussed, and as Mr. Childress himself concedes, those ejection fractions have been below 30, but they've also been 57, 40%, as well as 66% in October of 2010. What does he get for his asthma? Your Honor, I'm not exactly sure the particular... What does he get for his congestive heart failure? There are a list of drugs, which Your Honor pointed to on page 13 of the ALJ's decision. And I myself, not being medically trained, I'm not sure which of those go... So you're going to have congestive heart failure, and if you take a drug, you're fine? Is that what you're saying? Respectfully, the ALJ didn't find that he was fine and without impairments. There is still... What about his dyspnea? I don't know what Well, that's connected to the asthma. The COPD. And the things that he alleges, and the ALJ did not cherry-pick this record and only talk about the positive evidence, as it is clear by looking at this decision, the ALJ talked about all of the times that Mr. Childress complained about symptoms. What's atypical chest pain? It most likely results in chest pain that he's feeling at times when he would not expect chest pain, is my understanding. How does his obesity figure in? Does that affect the efficacy of these drugs? He's very obese. That's not something Mr. Childress has alleged. It's not something that is apparent from the record that he's somehow affected by his size. He is obese. The ALJ noted that, found that, and discussed within the listing discussion as well that there's not a particular listing for obesity, but that his size is considered when she was assessing his work function, which here again is a reduced range of sedentary. This is the lowest exertional level of work. The ALJ put additional postural limitations on there, as well as some mental. And with that, the ALJ found that he was able to do still some jobs. In fact, he did do a part-time job for eight months of the relevant period of time. When he was alleging these work-preclusive symptoms, he was still working as a cook between April 2009 and around November 2009. And I see I'm out of time. Unless the Court has any more questions, the Commissioner rests on the arguments made in her brief, and we respectfully ask that you affirm the District Court's decision. Okay. Thank you, Ms. Hand. Ms. Kupier? What do we know about the overall effects of all these drugs he takes? Has that been had significant, significantly improved his health, his energy, his ability to walk around? No, that specifically, Your Honor, we'd submit that it did not. In terms of side effects that Your Honor was asking about earlier, there was not, I don't believe there was any testimony regarding the side effects, but we would refute the government's position that the, I see my, is that my time is concluding? No, go ahead. We would refute the government's position that the, there were no side effects, so we didn't make that argument, implicit in having these conditions and taking the medications are the side effects. There simply wasn't testimony on it. But in terms of what they've done, the effect, he continued, despite the periods of compliance, which were many in the record, as I mentioned earlier, only four instances that I counted of noncompliance over a five-year period, he consistently complained of shortness of breath. He complained to his primary care physician of swelling of his legs. He testified at the hearing that he was out of breath just sitting there at the hearing. He testified that he can't stand up, or he can't sit for 45 minutes to an hour because of cysts, which is another issue that he suffered from, that his primary care physician was treating him for. He had cysts between his legs and the back of his legs, and that was his testimony, not incorporated in the RFC that he could sit at an hour at a time. With respect to the testimony of the vocational expert, I see my time has concluded. No, go ahead. With respect to the testimony of the vocational expert, one of the reasons that the plaintiff asked, the appellant asked for a reversal is because the V.E. did testify with two or more absences, work would be precluded. He also testified that if the individual was off task at least 10% of the day, even if he remained at the workstation, it would preclude all work. There was a discussion at the hearing about what that meant. Our position, our question was essentially five minutes at a time, 10 minutes at a time, being off task per hour, and the V.E. responded saying there would be no work. So we find that even if this went back before the ALJ or the commissioner, that there would be no work. The end conclusion would be controlling weight should be given to the treating sources. What the vocational expert said he could do, what type of work would he do, would the expert say? The jobs. He said that based on the ALJ's hypothetical, he said he could do the job of addressing clerk, charge account clerk, and order clerk. These are all jobs categorized at sedentary, which requires sitting up to six hours. Well, he lives in Sullivan, Illinois? Excuse me? Your client lives in Sullivan, Illinois? I believe so. That's an address there in the trailer park. Do you know where that is? Not exactly. When you say sedentary, does that, because of what you said earlier about his cysts and so on, that he can't just sit hour on end? He has to get up and move around or something? That is correct. Avoid pain? He's being treated for cysts by his primary care physician. He testified to the cysts to the judge when she asked him about his ability to sit. The judge never asked or said to him, you know, I'm going to give you a job, you sit all day. She said, how long can you sit? He said, I don't know, maybe 45 minutes, maybe an hour, but I'd be up and down, up and down, because I have these cysts. I have cysts between my legs. I have cysts in the back of my leg. The second hearing, she testified about, he was asked about his fatigue. He said, I'm tired all the time. I'm fatigued just sitting here. I get panicky because he gets out of breath. So the dip sneer that Your Honor asked about earlier is really his exertion. It's the extreme fatigue. Dr. Hartman, a primary care physician, in rendering his opinion on the form, he indicated out of a 1 to 10, 10 being the worst, he circled 9 in terms of his fatigue. There was another question in that same form that asked how frequently would he experience symptoms, fatigue being one of them, that would interfere with his attention and concentration throughout the day. Dr. Hartman indicated frequently. So it's clear by all accounts in the record that the treating doctor's opinions are supported and they should have been given controlling weight, or at least that the judge should have went through the factor checklist, which would have assigned them break weight. There was no other opinion that the ALJ went with or gave greater weight to. And with that, we'd ask for a reversal. Okay. Well, thank you very much, Mr. Pierre and Ms. Han. And we'll move to our last